70 F.3d 638
 315 U.S.App.D.C. 77
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
NATIONAL ASSOCIATION OF REVERSIONARY PROPERTY OWNERS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and the United States of
America, Respondents.
 No. 94-1581.
 United States Court of Appeals, District of Columbia Circuit.
 Nov. 3, 1995.
 
 Before: BUCKLEY, WILLIAMS and HENDERSON, Circuit Judges.
 
 JUDGMENT
 
 1
 This case was heard on the record of the Interstate Commerce Commission and on the briefs and arguments by counsel. The court has accorded the arguments full consideration and has determined the issues presented occasion no need for a published opinion. See D.C.Cir.Rule 36(b). For the reasons set out in the accompanying memorandum, it is
 
 
 2
 ORDERED that the petition for review be denied.
 
 
 3
 The clerk is directed to withhold issuance of the mandate until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 41(a)(1).
 
 ATTACHMENT
 
 4
 National Association of Reversionary Property Owners v. ICC,
 
 
 5
 et al., No. 94-1581
 
 MEMORANDUM
 
 6
 The petitioner, National Association of Reversionary Property Owners (NARPO), petitions us to set aside an order of the Interstate Commerce Commission (ICC) denying a rulemaking request. NARPO argues that the ICC's decision not to initiate a rulemaking proceeding leaves in place procedures for converting railroad lines into trails that violate the reversionary interest owners' constitutional right to due process. We accord extraordinary deference to an ICC decision declining to initiate rulemaking. NARPO has not overcome this deference. Accordingly, NARPO's petition is denied.
 
 
 7
 A railroad that wants to stop operating a line of track must receive the ICC's permission either to permanently "abandon" or to temporarily "discontinue" the line.[1] 49 U.S.C. Sec. 10903. The ICC grants permission to abandon or discontinue a line when the "present or future public convenience" permits, 49 U.S.C. Sec. 10903, and there is no "qualified" person that wishes to operate a trail on the railroad line. 16 U.S.C. Sec. 1247(d). If a qualified person is willing to manage the trail, take legal responsibility for the trail and pay any taxes on the trail, the ICC cannot authorize the railroad to abandon or discontinue the line. See id. ("the Commission ... shall not permit abandonment or discontinuance"); see also Rail Abandonments--Use of Rights-of Way as Trails, 2 I.C.C.2d 591 (1986); Rail Abandonments--Supplemental Trails Act Procedures, 4 I.C.C.2d 152 (1987).
 
 
 8
 NARPO represents the owners of reversionary rights to railroad easements that are subject to or could be subject to trail use. Reversionary interest owners complain that the Congressional decision to prevent an abandonment and the resulting reversion if a train track can be converted to a trail takes their property without compensation. In Preseault v. ICC, 494 U.S. 1, 17 (1990), the Supreme Court held that a fifth amendment takings clause challenge to this Congressional decision was premature because the reversionary interest owner had not sought compensation, under the Tucker Act, in federal court. See also Preseault and 985 Associates Ltd. v. United States, No. 66 F.3d 1167 (Fed.Cir.1995) (denying compensation for trail conversion to Presault and other reversionary interest owners because reversionary interest owners purchased their interest in land subject to ICC's approval of abandonment or discontinuance). In 1988, the ICC granted NARPO's petition to reconsider the regulations implementing the Trails Act. Rail Abandonments--Use of Rights-of-Way as Trails--Supplemental Trails Act Procedures, Ex Parte No. 274 (Sub-No. 13) (May 23, 1988). The ICC declined to modify the regulations. Rail Abandonments--Use of Rights-of-Way as Trails--Supplemental Trails Act Procedures, Ex Parte No. 274 (Sub-No. 13) (May 18, 1989).
 
 
 9
 The ICC uses a three-stage process for railroad abandonment. A railroad must first file an application with the ICC and notify certain people of the planned abandonment or discontinuance so that the ICC can assess whether the public "convenience" supports the railroad's proposed change. 49 U.S.C. Sec. 10903-4. The application must state whether the land on which the railroad runs is suitable for public recreational use. 49 C.F.R. Sec. 1152.22(5). The railroad must mail notification of the proposed abandonment to certain government offices, organizations and "significant users." 49 C.F.R. Sec. 1152.20(a). In addition, the railroad must post a notice in each train station on the line to be abandoned and place a notice as an advertisement in local newspapers. Id. The notice must inform the public of its right to submit to the ICC comments on whether the land is suitable for "other public purposes." 49 C.F.R. Sec. 1152.21. After the filing and notification, the ICC decides whether the "present or future public convenience and necessity permit" the railroad to abandon the line. 49 U.S.C. Sec. 10903-4.
 
 
 10
 Even though the "public convenience" may permit an abandonment, Congress has forbidden the ICC to approve an abandonment if the Trails Act applies. 16 U.S.C. Sec. 1247(d). For the "applicability" stage, the ICC publishes a notice of abandonment in the Federal Register. 49 C.F.R. Sec. 1152.27(b); Rail Abandonments, 4 I.C.C.2d at 155. A person or organization that wants to operate a trail on the line must file a map of the area it wishes to operate in and agree to assume financial responsibility for the area. 49 C.F.R. Sec. 1152.29(a). After receiving applications from potential trail operators, the ICC "will determine whether the Trails Act is applicable." 49 C.F.R. Sec. 1152.29(b)(1)(i). The ICC may find that the Trails Act does not apply only if the trail operator files a non-conforming application (e.g., one that does not include a statement accepting legal liability). 49 C.F.R. Sec. 1152.29(b)(1)(ii)(A) (referring to compliance with Sec. 1152.29(a)).
 
 
 11
 Once the ICC determines that the public interest permits the abandonment but that the Trails Act applies, the ICC determines whether the railroad intends to negotiate a trail agreement. 49 C.F.R. Sec. 1152.29(b)(1)(ii)(B). If the railroad does not, the ICC issues a certificate of abandonment. Id. If a railroad indicates its intent to negotiate a trail agreement, the ICC issues a Certificate of Interim Trail Use or Abandonment (CITU).[2] 49 C.F.R. Sec. 1152.99(c). The railroad then selects a potential trail operator and starts to negotiate. 49 C.F.R. Sec. 1152.29(b)(5). If no agreement is reached within 180 days, the CITU becomes a certificate of abandonment. 49 C.F.R. Sec. 1152.99(c). If, however, the parties reach an agreement, the CITU authorizes the trail conversion and prevents abandonment. Id.
 
 
 12
 On March 29, 1994 NARPO petitioned the ICC to change the procedure to convert a railroad line to a trail. NARPO asked the ICC to modify its procedural rules to require either the railroad or the trail operator to "provide actual notice to the owners of reversionary interests in rights-of-way before [the ICC] approves conversion of those rights-of-way to trail use." (Petition for Rulemaking Concerning the Rails-to Trails Program, March 25, 1994.) The ICC denied the petition on July 27, 1994. Rail Abandonments--Use of Rights-of-Way as Trails--Supplemental Trails Act Procedures, Ex Parte No. 274 (Sub-No. 13). NARPO now seeks to have the ICC's July 27, 1994 decision set aside. The Rails to Trails Conservancy (RTC) and the Association of American Railroads (AAR) have intervened to support the ICC's current procedure.
 
 
 13
 NARPO asks us to review the ICC's decision not to initiate rulemaking.[3] As we have often remarked, an agency decision not to initiate rulemaking is accorded "extraordinary deference." Capital Network Sys., Inc. v. FCC, 3 F.3d 1526, 1533 (D.C.Cir.1993). Our review of "agency refusals to initiate rulemaking proceedings" is so circumscribed that it is " 'akin to non-reviewability.' " Id. at 1530 (quoting Cellnet Communication, Inc. v. FCC, 965 F.2d 1106, 1111 (D.C.Cir.1992)). Only in a " 'rare and compelling case' " will we overturn the ICC's refusal to initiate rulemaking. See Timpinaro v. SEC, 2 F.3d 453, 461 (D.C.Cir.1993).
 
 
 14
 NARPO attempts to avoid the customary standard of review by stressing the constitutional basis of its claim, invoking instead the "contrary to constitutional right" provision of the Administrative Procedure Act. See 5 U.S.C. Sec. 706(2)(B). NARPO argues that the failure of the current trail conversion procedure to require actual preconversion notice to reversionary interest owners violates the due process balance defined in Mathews v. Eldridge, 424 U.S. 319, 335 (1976).[4] It is not necessary for us to decide whether NARPO's constitutional argument alters our standard of review because we do not reach NARPO's constitutional claim. First, both NARPO and its members have other methods of challenging the constitutionality of the ICC's actions. Individual reversionary interest owners can seek review of constitutional claims after an ICC order approves a trail conversion. See 28 U.S.C. Sec. 2342; 28 U.S.C. Sec. 2321. Similarly, NARPO could have timely sought our review of the ICC's trail conversion procedure after the ICC completed its rulemaking in 1990. Second, NARPO does not allege that the order under review violates any constitutional right; instead it alleges that the consequence of the ICC order is that current allegedly unconstitutional procedures will remain in place. Because it is not the "agency action" under review that NARPO alleges violates its constitutional rights, the constitutional aspect of NARPO's claim does not alter our deferential standard of review.
 
 
 15
 The ICC refused to grant the petition to initiate rulemaking because it had previously considered similar arguments raised by NARPO. In the 1989 rulemaking proceeding, NARPO argued that reversionary interest owners should receive actual notice of the proposed trail conversion. The ICC rejected NARPO's plea over the dissent of one commissioner who was concerned that "a reversionary owner could suddenly discover that decisions affecting vital ownership interest were finalized before the owner could attempt to show that statutory criteria were not met." Rail Abandonments--Use of Rights-of-Way as Trails--Supplemental Trails Act Procedures, Ex Parte No. 274 (Sub-No. 13) (May 18, 1989).
 
 
 16
 The ICC gave three additional reasons for not requiring that reversionary interest owners receive actual notice before a trail conversion is authorized. First, the ICC believes that reversionary interest owners are already on notice of a proposed trail conversion because the ICC's procedures require publication of a notice of abandonment in both the Federal Register and in local newspapers where the line is located. 49 C.F.R. Sec. 1152.27(b); 49 C.F.R. Sec. 1152.20(a). The ICC also emphasizes that local publicity generated by a proposed trial conversion notifies reversionary interest owners. Second, the agency maintains that even a reversionary interest owner who does not know about a proposed trail conversion would have little to gain from actual notice because of the minimal role the landowner can play in the conversion decision. See Rail Abandonments, 4 I.C.C.2d at 156. Indeed, the ICC describes its own role as "ministerial." Id.; see Goos v. ICC, 911 F.2d 1283, 1295 (8th Cir.1990). Third, the ICC claims actual notice is expensive.
 
 
 17
 NARPO first argues that the earlier rulemaking is irrelevant. According to NARPO, the 1989 rulemaking involved a request for notification after the conversion was approved. Here, NARPO asks for notification before the ICC's applicability finding. NARPO argues that the difference in the timing of the requested notice makes this petition significantly different from its earlier one.
 
 
 18
 Regarding the ICC's three additional arguments for not requiring actual notice to reversionary interest owners, NARPO asserts, without supporting statistics, that many reversionary interest owners do not know of the trial conversion proceedings and that notifying reversionary interest owners would improve compliance with the statute. Because both the trail operator and the railroad have incentives to enter a trail conversion agreement, NARPO argues, neither organization is likely to inform the ICC of certain matters.[5] NARPO also claims that actual notice could be inexpensively implemented by "hir[ing] a high school student with a bicycle to ride down the line placing a notice in each landowner's mailbox." (Pet.Reply Br. at 7.)
 
 
 19
 We are not persuaded by NARPO's arguments; it has not demonstrated that this is the "rare and compelling case" that warrants reversing the ICC's decision not to initiate rulemaking. In its 1989 proceeding, the ICC considered the fact that reversionary interest owners may not be aware of the conversion until after the applicability hearing and decided not to require pre-hearing notice. Even were we to accept, which we do not, NARPO's contention that the ICC did not consider pre-hearing notice at the 1989 proceeding, factors such as the number of reversionary interest owners already on notice and the cost of requiring actual notice would not differ depending on the timing of the notice.[6] The ICC has not acted arbitrarily in declining to revisit the issue.
 
 
 
 [1]
 A railroad "discontinues" service when it stops operating a train line. A railroad "abandons" a line when it "discontinues" service with no intention to resume service. Mississippi Public Serv. Comm'n v. ICC, 662 F.2d 314, 317 (5th Cir.1981)
 
 
 [2]
 The procedure and terminology are a little different if the railroad seeks the ICC's approval to cease operating a line that in fact has not been in use for some time. This "abandonment exemption" proceeding culminates in a NITU (Notice of Interim Trail Use of Abandonment) rather than a CITU. A NITU notice must include a notification to the public that it can request trail use. 49 C.F.R. Sec. 1105.12 App
 
 
 [3]
 NARPO's petition would perhaps be more correctly described as a petition to reopen rather than to initiate rulemaking. First, the pre-conversion notice requested here differs little from the post-conversion notice requested in 1988. See Rail Abandonments--Use of Rights-of-Way as Trails--Supplemental Trails Act Procedures, Ex Parte No. 274 (Sub-No. 13) (Feb. 13, 1990). Second, and more telling, NARPO asserts jurisdiction based on 28 U.S.C. Sec. 2321 ("enjoin ... an order") rather than on 49 U.S.C. Sec. 10326(b) ("begin a proceeding"). Under ICC v. Locomotive Eng'rs, 482 U.S. 270 (1987), we cannot review an ICC denial of a petition to reopen rulemaking that complains only of legal error. The ICC, however, agrees with NARPO that NARPO's 1994 petition requested a new rulemaking proceeding. We therefore likewise construe NARPO's request
 
 
 [4]
 Both the ICC and NARPO refer to the following passage: "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335
 
 
 [5]
 For example, NARPO argues that a trail covering only a small section of a lengthy rail corridor may not be "subject to restoration or reconstruction for railroad purposes," 16 U.S.C. Sec. 1247(d), because there is no use for "a railway beginning and ending in the middle of nowhere." (Pet'r Br. at 29.) NARPO suggests that only its members have an incentive to inform the ICC that a proposed trail may not satisfy the statutory requirements. In response, the ICC claims that "there is rarely any serious issue" that the trail proposal meets the requirements. See Rail Abandonments, 4 I.C.C.2d at 156
 
 
 [6]
 Nonetheless, we doubt that Federal Register notice alone would support the ICC's conclusion that most reversionary interest owners are thereby on notice. Cf. Government of Guam v. United States, 744 F.2d 699, 701 (9th Cir.1984)